UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAYLA GRUBINSKI,

Plaintiff,

v.

AXIS COMPANY, LLC,
d/b/a AXIS AUTOMATION,

Defendant.

File No. 1:26-cv-3031

Hon.

# COMPLAINT AND JURY DEMAND

## COMPLAINT

Plaintiff Kayla Grubinski, by her attorneys, Pinsky Smith, PC, states as follows:

## Jurisdiction, Parties, and Venue

1. This is an action requesting the Court to remedy violations of the Americans with Disabilities Act of 1990, 42 USC §12101 *et seq.* (the "ADA"), Michigan's Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.* ("PDCRA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), MCL § 37.2101, *et seq.*

2. In violation of these state and federal statutes, Defendant Axis Company, LLC, doing business as Axis Automation ("Axis," "Defendant," or "Company") discriminated against and harassed Plaintiff because of her sex and disability, failed to make reasonable accommodations for her, retaliated against her for her complaints about discrimination, and ultimately, constructively terminated her employment.

3. This Court has jurisdiction over this Complaint under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1367.

4. Plaintiff is a resident of Kent County, Michigan, and the Western District of Michigan, Southern Division. At all times relevant to this Complaint, Plaintiff was Defendant's employee.

5. Plaintiff is a woman, and she has a disability as recognized under the ADA and the PDCRA.

6. Defendant is a manufacturer, located in Grand Rapids, in the Western District of Michigan, Southern Division.

7. At all times relevant to this Complaint, Defendant employed at least 15 employees.

8. Defendant is an employer as recognized in Title VII, the ELCRA, ADA, and the PDCRA.

9. Venue is proper within this judicial district under 28 USC §1391.

## Statement of Facts

### *A. Introduction*

10. Plaintiff began working for Axis Automation on March 11, 2024.

11. Defendant hired Plaintiff as a CNC machinist.

12. Upon information and belief, Plaintiff was the first and only woman Defendant ever hired for the role of CNC machinist or for any manufacturing role.

13. Upon information and belief, the only other women Defendant has employed work in an administrative capacity for the Company.

14. Plaintiff is a mother with one young son. Defendant was also aware of her parental responsibilities and need for occasional scheduling flexibility to care for her son.

15. Defendant was aware of Plaintiff's Type I Diabetes disability, as well as her need for reasonable accommodations.

16. At all times relevant to this Complaint, Plaintiff was able to perform the essential functions of her position with reasonable accommodations.

### *B. Mr. Solem Monitored Plaintiff's Restroom Breaks and Penalizes Her for Them.*

17. Defendant typically scheduled employees with ten-hour shifts, including a paid lunch break and two other ten-minute break periods throughout the day.

18. Because of her disability, Plaintiff requested reasonable accommodations including more frequent breaks to eat and visit the restroom because of the additional water she was required to drink to help regulate her blood sugar.

19. Defendant officially approved these accommodation requests.

20. However, despite having approved the accommodations, Plaintiff's supervisor Jeff Solem, the Machining Manager, discriminated against her, harassed her, and retaliated against her because of them.

21. There were two restrooms designated for the manufacturing team: a multi-stall restroom and a single-user restroom. To accommodate both men and women working on the manufacturing floor, Defendant designated the multi-stall restroom as a male's restroom and the single-room as a women's restroom.

22. Mr. Solem became hypervigilant, monitoring and timing Plaintiff's restroom breaks. Mr. Solem did not monitor or time the restroom breaks of any other employee.

23. Mr. Solem frequently commented on the number of restroom breaks she took, and he either denied her requests to use the restroom or threatened to write her up for them.

24. Mr. Solem referred to her restroom breaks as "excessive."

25. Mr. Solem even positioned his desk so that he could have a better view of the restroom Plaintiff used, so he could better track and time her breaks.

26. Humiliated by this level of scrutiny, Plaintiff began recording the frequency and duration of her restroom breaks. She visited the restroom an average of six times, typically no longer than 5 minutes per visit, during a full-day shift.

27. Despite the approved accommodation, Mr. Solem continued to criticize the frequency and duration of her restroom breaks.

### C. *Mr. Solem Criticized and Penalized Plaintiff for the Accommodations he Approved.*

28. Defendant at times expected 50 hours of work from each employee, with 10-hour shifts.

29. Most of Defendant's employees worked from 6am to 4pm.

30. When Plaintiff began working for Defendant, she was offered a modified schedule, starting after she dropped her son off at school at 8:30, instead of the 6am start time.

31. Under Plaintiff's approved schedule, she would need to work until 6:30 to get 10 hours of work.

32. However, Defendant frequently sent Plaintiff home before 6:30 because she was the last employee on the floor, and she was told she was not allowed to stay by herself.

33. Although she generally still worked 40 or more hours in a week, she was often not able to work 50 hours.

34. Again, although he approved her schedule and knew she was often sent home because she was the last one on the floor (even if she was prepared and willing to work later), Mr. Solem frequently criticized Plaintiff for failing to work enough hours, without explaining how she could possibly do anything differently.

35. Mr. Solem approved the later start time but still criticized her for being late.

36. Plaintiff was awarded ten calendar days of paid time off ("PTO") when she began working for Defendant.

37. Plaintiff used her PTO in accordance with company policy for appropriate reasons (including personal errands, childcare issues, even medical appointments), and she never used more than she had available.

38. Despite this, Mr. Solem also berated her use of PTO and accused her of having an attendance "problem."

39. Although he initially expressed support of the fact that she is a mother with a young son and promised flexibility with her schedule as needed, anytime she used PTO, he later criticized her for doing so.

40. Mr. Solem was not this focused on any other employee's use of PTO, never commented on any other employee's "family obligations," and didn't seem to have a problem with anyone else using their PTO.

41. Some of Plaintiff's PTO usage was related specifically to her disability, as she occasionally suffered from diabetic seizures or needed an occasional medical appointment.

42. Even when it was related to her disability, this didn't matter to Mr. Solem. He continued to use every absence against her, claiming attendance was a "burden on the team."

43. Plaintiff always informed Mr. Solem as soon as she was able about her upcoming absences. She only used a handful of days of PTO, and because she was afraid to use PTO for any planned purpose anyway, the time was often for unplanned

personal or medical issues—such as school snow days, medical episodes. Because these absences arose unexpectedly, Plaintiff could not provide advance notice, but notified Mr. Solem as soon as she was able.

44. Mr. Solem specifically identified the scheduling issues and her use of PTO as an "attendance problem" in her performance reviews.

45. Despite her otherwise overall positive performance, Mr. Solem used her approved schedule, accommodated breaks, and attendance (even when it was related to her disability) against her to reduce or deny her raises.

46. Mr. Solem treated Plaintiff differently with PTO usage as well. When she would take 8 hours of PTO for a work day, he would require her to make up the additional 2 hours (since they work 10-hour days), but he did not require her male, non-disabled colleagues to do the same.

47. Plaintiff specifically reported this discrimination to Ms. Patton.

48. Mr. Solem even issued her a disciplinary action for missing work for a medical reason.

49. On June 10, 2024, Plaintiff suffered a seizure due to her blood sugar issues and had to miss a day of work. She informed Mr. Solem about her absence and the reason for it as soon as she was able.

50. That same day, June 10, 2024, Mr. Solem issued her a written warning, indicating the following conduct violation: "excessive absenteeism, tardiness or failure to timely call-in absences or tardiness." He also stated that she had "failed to

provide adequate prior notification" and that her failure to do so was "disruptive" and created an "undue burden on others."

51. Plaintiff attempted to explain that the diabetic seizure was unforeseeable and that she had notified him as soon as she was able. Mr. Solem nevertheless issued the discipline.

52. At the time Mr. Solem issued this write up, Plaintiff had not even used one week of PTO in the previous months.

53. Mr. Solem openly and publicly criticized her for having a "terrible work ethic" because of her schedule, what he viewed as her attendance "problems," and the additional breaks she needed during the day.

54. On one specific occasion, October 10, 2024, Mr. Solem against screamed at Plaintiff in front of workers, criticizing her work ethic and what he characterized as "excessive" restroom breaks. When she began crying, he yelled louder, asked if "something was F****** wrong" with her and told her she needed to get her "priorities straight."

55. Mr. Solem sent her home without pay for the rest of the day.

*D. Mr. Solem Discriminatorily Required Plaintiff to Punch Out for Lunch Breaks.*

56. A few months into her employment, Plaintiff, the only woman and only individual on the floor with Diabetes, learned that she was the only one required by Mr. Solem to punch out for her lunch breaks.

57. She only learned this because another employee told her she was the only one punching out and that she was being discriminated against by Mr. Solem.

58. At first, on or around April 17, 2024, Mr. Solem told her she needed to work through lunch.

59. Mr. Solem later told her she had to punch out for lunch if she was going to leave the premises for lunch, despite the fact that many other employees (including Mr. Solem) would also leave the premises for lunch or other breaks, and they were not required to punch out.

60. Mr. Solem himself frequently leaves the premises for lunch and also to handle personal or family matters, as do other employees, but he only ever complained and penalized Plaintiff for doing so.

61. When school started for Plaintiff's son in August of 2024, Mr. Solem decided that Plaintiff was no longer allowed a later start time of 8:45am, and that she needed to come in at 6:00am.

62. As that point, Mr. Solem allowed her to leave work to take her son to school at 8:30am (and she took her lunch break then), but he eventually revoked that flexibility as well.

### *E. Plaintiff Complained to Human Resources, and the Investigation Confirmed She was Treated "Differently" with Discriminatory "Restrictions."*

63. On December 13, 2024, Mr. Solem yet again berated Plaintiff over what he referred to as her "excessive" restroom breaks and snacks, and this time, Plaintiff decided to bring the matter to Human Resources.

64. Mr. Solem and Plaintiff met with Human Resources Manager, Ms. Jamie Patton that same day.

65. During this meeting, Mr. Solem continued to categorized Plaintiff's restroom breaks as "excessive"—in front of Ms. Patton.

66. Mr. Solem also compared her with her male colleagues, and alleged that they did not have "attendance" problems like she did. He also criticized her "family obligations" with respect to her time off requests.

67. Immediately following this meeting, Mr. Solem took Plaintiff's colleague, another machinist, Tyler Long, out to lunch, upon information and belief, in an effort to sway Mr. Long's opinion on the matter.

68. Mr. Long became the lead in the department a month later.

69. As a result of Plaintiff's complaints of illegal discrimination and harassment, Human Resources investigated the allegations.

70. On December 16, Plaintiff met with Ms. Patton again, this time along with Administrative Coordinator Paige Slawkowski. During this meeting, Plaintiff explained that Mr. Solem had continued discriminating, harassing, and retaliating against her, and that he was turning other employees against her. She explained how nervous she was to use the restroom during her workday, and that she was required to punch out for lunch when no one else was required to do the same. She also explained how Mr. Solem was refusing to teach her certain things and making it difficult for her to do her job.

71. Ms. Patton indicated that she was interviewing everyone involved in the matter and that she was taking it seriously.

72. On December 19, Plaintiff, Mr. Solem, and Ms. Patton met again.

73. During this meeting, Ms. Patton informed them that she concluded Mr. Solem had treated Plaintiff "differently" because of Plaintiff's accommodation requests.

74. Ms. Patton acknowledged that Mr. Solem had placed "restrictions" on Plaintiff that he didn't give anyone else.

75. Ms. Patton instructed Mr. Solem to stop these discriminatory actions.

76. Ms. Patton also acknowledged that Mr. Solem had expected Plaintiff to perform tasks outside her job description, evaluated her work unfairly, and expected her to learn independently.

77. Mr. Solem again complained about the "excessive" amount of time it took Plaintiff to use the restroom, in his opinion.

78. In this meeting, Mr. Solem also changed Plaintiff's work schedule again, indicating that starting in January, she could no longer leave work to bring her son to school in the morning. This required Plaintiff to find someone else to take him to school in a short amount of time.

79. Even Ms. Patton objected to this and told Mr. Solem that wasn't fair or enough time for Plaintiff to arrange alternate childcare for her son.

80. Plaintiff objected, stating that Mr. Solem was changing her schedule to force her to quit.

81. At that suggestion, Mr. Solem "smiled" and sarcastically stated, "Why would I do that?"

82. Mr. Solem changed Plaintiff's work schedule in retaliation for her complaints of illegal discrimination.

83. Even Ms. Patton agreed that this was illegal retaliation. After Mr. Solem left, Ms. Patton indicated to Plaintiff that she was doing what she could to support Plaintiff and that Mr. Solem was likely changing the schedule because he was angry that Ms. Patton had told him he was treating Plaintiff illegally and needed to stop.

84. Upset and worried that she would lose her job unless she could figure out childcare for her son in a short amount of time over a holiday period, Plaintiff requested to leave early, using PTO for the rest of the day.

85. On her way out of the shop, Plaintiff overheard Mr. Solem again complaining loudly about Plaintiff to a colleague—despite Ms. Patton having specifically instructed him not to talk about Plaintiff with other employees.

86. Plaintiff informed Ms. Patton what she had observed.

87. The next day, December 20, 2024, the harassment continued. Mr. Solem sent an email threatening the manufacturing employees that they needed to turn down their radios or they would lose the ability to listen to them—Plaintiff was the only one listening to a speaker at that time.

88. Plaintiff went to Ms. Patton's office. She complained again that she was being targeted and harassed, and that she felt she couldn't continue working in this environment with Mr. Solem.

89. Ms. Patton agreed with her and called the company's owner, Mr. Boyd Vor Broker.

90. Plaintiff overheard the entire conversation between Ms. Patton and Mr. Vor Broker. She heard Ms. Patton explain the illegal behavior, she heard Mr. Vor Broker acknowledge that Mr. Solem was indeed "targeting" Plaintiff, voice concern that the company could get sued for it, and indicate that he was concerned Mr. Solem was a problem.

91. Ms. Patton stated that she believed Mr. Solem should be terminated.

92. Ms. Patton sent Plaintiff home for the rest of the day, with pay, while they figured out what to do.

93. On December 22, 2024, Plaintiff texted Ms. Patton that she was anxious about returning to work. Ms. Patton responded that Mr. Vor Broker had talked with Mr. Solem and that his treatment of her should be better now.

94. However, on December 23, 2024, when Plaintiff arrived to work, another employee came up to her and informed her that Mr. Solem was openly complaining about her to other employees and indicating that he intended to find a way to fire her or make her quit.

95. Evidently, a group of employees including Mr. Solem had been in the parking lot drinking alcohol after work on December 20, 2024, and in that group, Mr. Solem shared that he wants her terminated.

96. Shortly after this, things escalated even further. While working, Plaintiff asked a colleague, Tyler Long, for assistance with a part. Mr. Solem had already told her not to bother him with any questions that day.

97. However, Mr. Long informed her that he was unable to help her because Mr. Solem had forbidden him from doing so, and that if she asked for help with something, he had to tell her to "YouTube" a solution herself.

98. Plaintiff did fix the issue herself, but it took hours for her to learn how to complete the task that a colleague could have shown her how to do quickly.

99. Incredibly frustrated, stressed, and overwhelmed, Plaintiff left work that day, December 23, partially through her shift. She messaged Ms. Patton to explain why she was leaving and even offered to return later in the day if Mr. Solem went home so that she could complete her shift. Ms. Patton indicated she understood. She also indicated that Mr. Vor Broker had informed her to stop intervening in the situation and let it resolve itself.

100. The company was closed December 24 and December 25.

101. Because Plaintiff needed the income and had no other employment available, she returned to work on December 26, 2024.

102. Unexpectedly, Mr. Solem apologized to Plaintiff in a team meeting that morning.

103. He also talked with Plaintiff privately, stating that he was dealing with some personal things, had recently begun a different medication, that he knew his behavior had been unfair towards her, and that he wanted to start over.

104. Plaintiff accepted the apology and was optimistic that his treatment of her would change and she'd be able to continue working for the company.

### *F. Defendant Denied Plaintiff Holiday Pay When She was Unable to Work Due to Mr. Solem's Discrimination and Harassment.*

105. On January 3, 2025, Plaintiff learned that Defendant had denied her holiday pay for Christmas because she had left partway through her December 23 shift.

106. Plaintiff met with Ms. Patton again about the situation. In this meeting, Plaintiff again explained the hostile environment she was facing under Mr. Solem's leadership, even though she was hopeful things were getting better.

107. Ms. Patton acknowledged it was "unfair" and that she had advocated for Plaintiff, but that Mr. Vor Broker had been swayed by Mr. Solem before she could talk with him.

108. Upon information and belief, Mr. Solem advocated against giving Plaintiff the holiday pay in retaliation against her for her complaints of his illegal treatment of her.

109. Plaintiff also raised the holiday-pay denial directly with Mr. Vor Broker, indicating that the hostile work environment had forced her to leave work that day, and that she shouldn't be penalized because of it.

110. Mr. Vor Broker acknowledged that Mr. Solem had been "inconsistent in providing accommodations" and "needed to change those to level the playing field for the entire team."

111. Plaintiff never received the holiday pay.

*G. Mr. Solem Continued Discriminating and Harassing Plaintiff, Leading to her Constructive Termination.*

112. In the beginning of 2025, Mr. Solem continued discriminating against her and retaliating against her.

113. By this point, Plaintiff realized Defendant was either unwilling or unable to truly hold Mr. Solem accountable and stop his improper treatment of her, so she stopped attempting intervention with HR.

114. Again, Plaintiff needed the job and otherwise enjoyed working for Defendant, so she intended to ignore Mr. Solem and continue working as long as she could withstand his treatment of her. But this did not last long.

115. On February 25, 2025, Plaintiff requested emergency PTO as her father had suffered a stroke and she needed to be at the hospital with him. She texted Mr. Solem about this first thing in the morning and also offered to work extra hours the rest of the week if needed to make up the time.

116. He did not respond.

117. When she returned to work, Mr. Solem issued Plaintiff another write up for missing work.

118. In the write up, he alleged that she'd failed to work her required hours the week before.

119. Plaintiff had worked over 47 hours in the week before.

120. Mr. Solem also threatened that termination would follow the next alleged violation.

121. This write up was pretextual, prompted by Mr. Solem's intention to discriminatorily penalize Plaintiff's use of PTO for a family emergency, when he did not treat other (male, nondisabled) employees the same.

122. This writing up was pretextual, prompted by Mr. Solem's continued pattern of discrimination, harassment, retaliation against Plaintiff on account of her sex and disability and complaints about his illegal treatment of her.

123. Realizing that he would never stop treating her differently and he would continue to make her job miserable until he could force her to quit, Plaintiff had no choice but to resign that day.

124. Defendant's actions harmed Plaintiff emotionally, physically, and financially.

## Statutory Prerequisite

125. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission.

126. Plaintiff received a Notice of Right to Sue from the EEOC.

127. This action has been filed within 90 days of the receipt of Plaintiff's Notice of Right to Sue.

## COUNT I – Violation of the Americans with Disabilities Act

128. Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

129. Defendant violated the ADA when it discriminated against Plaintiff on account of her disability, failed to effectively provide her a reasonable

accommodation, subjected her to a hostile work environment, and then retaliated against her for requesting an accommodation and for her complaints about her supervisor's illegal treatment of her.

130. Although Defendant approved her accommodation requests, it also effectively denied them when her supervisor repeatedly berated her for them, issued or threatened to issue disciplinary action for them, and forced her to continue working in conditions that worsened her condition both mentally and physically.

131. Defendant repeatedly retaliated against Plaintiff because she requested reasonable accommodations and complained of illegal discrimination.

132. Defendant constructively terminated Plaintiff.

133. As a result, Plaintiff has suffered and will continue to suffer harm.

## Relief

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a. Award Plaintiff damages equal to lost earnings, benefits, and/or other compensation denied or lost to her by reasons of Defendant's illegal conduct, plus interest;

b. Award Plaintiff compensatory damages for mental anguish and emotional distress;

c. Award Plaintiff punitive damages;

d. Award Plaintiff's costs and reasonable attorney's fees;

e. Issue an order reinstating Plaintiff in an appropriate position; and

f. Award Plaintiff other relief as may be just and equitable

## COUNT II – Violation of Michigan's Persons with Disabilities Civil Rights Act

134. Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

135. Defendant violated the PDCRA when it discriminated against Plaintiff on account of her disability, failed to effectively provide her a reasonable accommodation, subjected her to a hostile work environment, and then retaliated against her for requesting accommodations and for her complaints about her supervisor's illegal treatment of her.

136. Although Defendant technically approved her accommodation requests, it also effectively denied them when her supervisor repeatedly berated her for them, threatened her with disciplinary action and/or issued disciplinary action for them, and forced her to continue working in conditions that worsened her condition.

137. Defendant repeatedly retaliated against her for her disability and requesting accommodations.

138. Defendant constructively terminated Plaintiff.

139. As a result, Plaintiff has suffered and will continue to suffer harm.

## Relief

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a. Award Plaintiff damages equal to lost earnings, benefits, and/or other compensation denied or lost to her by reasons of Defendant's illegal conduct, plus interest;

b. Award Plaintiff compensatory damages for mental anguish and emotional distress;

c. Award Plaintiff exemplary damages;

d. Award Plaintiff's costs and reasonable attorney's fees;

e. Issue an order reinstating Plaintiff in an appropriate position; and

f. Award Plaintiff other relief as may be just and equitable.

<u>COUNT III – Violation of Title VII of the Civil Rights Act of 1964 – Sex Discrimination, Harassment, and Hostile Work Environment, and Retaliation</u>

140. Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

141. Defendant violated 42 U.S.C. § 2000e when it discriminated against her, treated her differently than other employees, harassed her, subjected her to a hostile work environment, retaliated against her, and ultimately constructively terminated her on account of her sex.

142. As a result, Plaintiff has suffered monetary and other harms.

<u>Relief</u>

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a. Award Plaintiff damages equal to lost earnings, benefits, and/or other compensation denied or lost to her by reasons of Defendant's illegal conduct, plus interest;

b. Award Plaintiff compensatory damages for mental anguish and emotional distress;

c. Award Plaintiff punitive damages;

d. Award Plaintiff's costs and reasonable attorney's fees;

e. Issue an order reinstating Plaintiff in an appropriate position; and

f. Award Plaintiff other relief as may be just and equitable.

## COUNT IV – Violation of the Elliott-Larsen Civil Rights Act – Sex Discrimination, Harassment, Hostile Work Environment, and Retaliation

143. Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

144. Defendant violated ELCRA when it discriminated against her, treated her differently than other employees, harassed her, subjected her to a hostile work environment, retaliated against her, and ultimately constructively terminated her on account of her sex.

145. As a result, Plaintiff has suffered monetary and other harms.

## Relief

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a. Award Plaintiff damages equal to lost earnings, benefits, and/or other compensation denied or lost to her by reasons of Defendant's illegal conduct, plus interest;

b. Award Plaintiff compensatory damages for mental anguish and emotional distress;

c. Award Plaintiff punitive damages;

d. Award Plaintiff's costs and reasonable attorney's fees;

e. Issue an order reinstating Plaintiff in an appropriate position; and

f. Award Plaintiff other relief as may be just and equitable.

Dated: October 22, 2026

PINSKY SMITH, PC
Attorneys for Plaintiff

By /s/ Crystal J. Bultje
Crystal J. Bultje (P80276)
146 Monroe Center, N.W., Suite 418
Grand Rapids, MI 49503
(616) 451-8496

## JURY DEMAND

To the extent jury trial is allowed with regard to any of the issues herein, Plaintiff demands same.

Dated: October 22, 2026

PINSKY SMITH, PC
Attorneys for Plaintiff

By /s/ Crystal J. Bultje
Crystal J. Bultje (P80276)
146 Monroe Center, N.W., Suite 418
Grand Rapids, MI 49503
(616) 451-8496